George Washington **DURHAM**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 21650.

United States Court of Appeals
Ninth Circuit.

Nov. 8, 1968.

Jonathan U. Newman (argued), of Cake, Jaureguy, Hardy, Buttler & McEwen, Portland, Or., for appellant.

Jack G. Collins (argued), Asst. U. S. Atty., Sidney I. Lezak, U. S. Atty., Portland, Or., for appellee.

Before JERTBERG and BROWNING, Circuit Judges, and *BOLDT, District Judge.

BROWNING, Circuit Judge:

Appellant was charged with three violations of 18 U.S.C. § 474. Count I of the indictment involved possession of a counterfeit $20 Federal Reserve Note; Count II, possession of a second $20 Federal Reserve Note; and Count III, possession of a plate to be used for making counterfeit $5 United States Notes.

Appellant was convicted under Count II. For reasons unrelated to this appeal, the other counts were dismissed by the court—Count III after all the evidence was in, and Count I after verdict.

The note and plate referred to in the dismissed counts were obtained by the government when Secret Service agents searched appellant's house trailer on May 5, 1966, pursuant to a warrant issued the same day.[1] The note referred to in Count II was found in appellant's wallet on May 7, 1966, under circumstances described later.

Appellant contends that the material seized on May 5 should have been excluded from evidence because the affidavit supporting the search warrant failed to establish probable cause and the search was therefore unlawful.

■ At the threshold, appellee suggests that we need not consider the validity of the May 5 search because the evidence seized related to the dismissed counts. Appellant argues that we must reach the issue for two reasons. First, he asserts that the note referred to in Count II, upon which he was convicted, was discovered as a result of the May 5 search and should have been suppressed as fruit of that search. For reasons stated later, we reject this contention. Second, appellant points out that the evidence seized on May 5 was admitted without limitation to particular counts of the indictment and argues that its admission adversely affected his defense to Count II. We agree. As the trial court indicated in its charge to the jury, the evidence was relevant on the issue of appellant's intent in possessing the counterfeit bill involved in Count II, and was highly incriminating. If it was improperly admitted, we cannot say, beyond a reasonable doubt, that the error did not contribute to appellant's conviction. Chapman v. California, 386 U.S. 18, 26, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The affidavit upon which the search warrant was issued is set out in full in the margin.[2] We need consider only one

---

* Honorable George H. Boldt, United States District Judge, Western District of Washington, sitting by designation.

1. Besides these items, the agents seized from the trailer—and the government introduced at trial—nearly $20,000 in counterfeit twenties and numerous articles which could be used in a photoengraving counterfeiting process.

2. AFFIDAVIT FOR SEARCH WARRANT BEFORE LOUIS STERN, Portland, Oregon

The undersigned being duly sworn deposes and says:

That he (has reason to believe) that on the person of George W. Durham (on the premises known as) Orville Fredrick Killingbeck Chicken Farm, 7911 S. E. Thies-

of the many grounds upon which appellant challenges its sufficiency.

■ The facts submitted to the Commissioner must be sufficient to justify a conclusion by him that the property which is the object of the search is probably on the person or premises to be searched at the time the warrant is issued. The most convincing proof that the property was in the possession of the person or upon the premises at some remote time in the past will not justify a

sen Road, Milwaukie, Oregon, and more particularly in a 1959 Traveler trailer, white color, and in a 1955 Dodge Sedan, Oregon License 8M-5106 located at said premises in the District of Oregon, there is now being concealed certain property, namely certain twenty dollar counterfeit federal reserve notes and other counterfeiting paraphernalia which are (See attached sheet).

And that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows: (See attached sheet)

/s/ Frank J. Kenney
Frank J. Kenney
Special Agent in Charge of
Secret Service

Sworn to before me, and subscribed in my presence, May 5, 1966.

/s/ Louis Stern
Louis Stern United States
Commissioner.

STATEMENT BY FRANK J. KENNEY, SPECIAL AGENT IN CHARGE OF SECRET SERVICE

* (1) On July 12, 1965, a new issue $20 counterfeit note on the Federal Reserve Bank of San Francisco, Series 1950D, Serial Number L54406434C, Check Letter "J", Face Plate Number 254, Back Plate 830, was received by the Metropolitan Branch, U. S. National Bank of Oregon, Portland, Oregon, as part of a deposit to the account of the Oregon State Liquor Commission Store, Store #30, Portland, Oregon. On examination of this note, on the back on the border of the left lower corner was an inked notation "8 M 5106", which conforms with the Oregon State Motor Vehicle licensing schedule.

(2) The Oregon State Motor Vehicle Department, Salem, Oregon, records reflect that this license number is assigned to George W. Durham, Box 214, Clackamas, Oregon, for a 1955 Dodge sedan.

(3) On July 19, 1965, George W. Durham appeared at the Commercial Paper

Co., 300 Brannan, San Francisco, and attempted to make a purchase of 100% Anniversary Bond paper, which has been identified as the type of paper used in the printing of the counterfeit notes. This type bond paper was not available and Durham purchased six reams (8½" x 11") of Agawam bond. At the time of purchase Durham informed the paper company employee that he was making the purchase for a man in Clackamas, Oregon, who made auto glass patterns and needed the paper for a technical manual. Durham at time of sale displayed his Oregon Driver's license and gave his address as Box 246, Willamina, Oregon, which is the post office box of Roy E. Durham, brother of George Durham.

(4) Investigation has developed that George W. Durham during the years 1964 and 1965 was engaged with Archie Leo Mishler aka Tom Mishler in his printing business at Route 1, Box 483, Clackamas, Oregon. Tom Mishler was arrested by the Secret Service on March 20, 1956, for counterfeiting currency and was placed on probation.

(5) Within recent weeks, a confidential informant has furnished the Government information that during 1964 and 1965 George W. Durham and Tom Mishler had printed up some $20 counterfeit notes.

(6) Durham is residing in a 1959 Traveler trailer, white color, which he is purchasing under contract from Blake and Neal Finance Co., Portland, Oregon. The trailer and vehicle of Durham's is located at Orville Fredrick Killingbeck Chicken Farm, 7911 S.E. Thiessen Road, Milwaukee, Oregon, where Durham is employed.

/s/ Frank J. Kenney
Frank J. Kenney, Special Agent
in Charge of Secret Service

present invasion of privacy. There must be reasonable grounds for believing that the immediate search for which authority is sought may be fruitful.

This was made clear by the Supreme Court in Sgro v. United States, 287 U.S. 206, 210, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932), the Court stating, "it is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." [3] The prin-

3. Although *Sgro* dealt with a statute (Act of June 15, 1917, Tit. XI), the statutory

---

* Paragraph numbers added.

ciple has been applied in an unbroken line of decisions.[4] For at least twenty years it has been clearly stated in the official instructions to United States Commissioners:

A showing to the effect that the property to be seized was at the place to be searched a substantial time before the application is made does not justify the issuance of a search warrant, for the reason that during the intervening period the property may have been moved away. The facts must show that the property to be seized was known to be at the place to be searched so recently as to justify the belief that the property is still there at the time of the issuance of the search warrant.

Manual for United States Commissioners 24 (1948).

■ Whether the showing in support of the issuance of the warrant here meets this test must be determined by an examination of all of the circumstances presented to the Commissioner in the affidavit.[5]

The first paragraph of the affidavit recited the passing of a counterfeit note on July 12, 1965. The third paragraph described a purchase on July 19, 1965, of paper useable in counterfeiting. Both paragraphs described single events which preceded the issuance of the warrant by almost ten months.

■ Paragraphs four and five of the affidavit disclosed continuing courses of conduct. Paragraph four recited that in 1964 and 1965 appellant worked in a printing business with a man arrested for counterfeiting in 1956; paragraph five stated that in the same years the two men printed up some counterfeit notes. Even assuming these activities continued throughout 1965, the period during which they are said to have occurred ended more than seventeen weeks before the warrant was issued.[6]

provisions involved were substantially the same as Fed.R.Crim.P. 41(c), (d). See 287 U.S. at 209–210, 53 S.Ct. 138. In addition, the Court applied the general constitutional principle that the Fourth Amendment "together with legislation regulating the process, should be liberally construed in favor of the individual." Id. at 210, 53 S.Ct. at 140.

4. E.g., Rosencranz v. United States, 356 F.2d 310, 317–318 (1st Cir. 1966); Rider v. United States, 355 F.2d 192, 193 (5th Cir. 1966); Schoeneman v. United States, 115 U.S.App.D.C. 110, 317 F.2d 173, 177 (1963); United States v. Ramirez, 279 F.2d 712, 715 (2d Cir. 1960). The earlier authorities are collected in Annot., 100 A.L.R.2d 525 (1965). See also Rugendorf v. United States, 376 U.S. 528, 533, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); Jones v. United States, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); 8 J. Moore, Federal Practice ¶¶ 41.05, 41.06, at 41–19.

5. In reviewing determinations of probable cause, the court may consider only the information brought to the magistrate's attention. Aguilar v. Texas, 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). It has also been held that Fed.R.Crim.P. 41(c)'s provision that a warrant may issue "only on affidavit * * * establishing the grounds" for

issuance means that the affidavit by itself must establish probable cause for a federal search warrant. United States v. Freeman, 358 F.2d 459, 462 (2d Cir. (1966). See also United States v. Sterling, 369 F.2d 799, 802 n. 2 (3rd Cir. 1966); Rosencranz v. United States, 356 F.2d 310, 317 (1st Cir. 1966). In any event, so far as appears from the record in this case, the warrant was issued solely on the basis of the affidavit, and therefore the affidavit alone must establish probable cause. Information known to the government agents but not included in the affidavit must be disregarded.

6. The length of the time lapse alone is not controlling since even a brief delay may preclude an inference of probable cause in some circumstances while in others a relatively long delay may not do so. Nonetheless, there are obviously some limits. In Schoeneman v. United States, 115 U.S.App.D.C. 110, 317 F.2d 173, 177 (1963), Judge Wright noted "that the Government could cite, and we could find, no case which sustained a search warrant issued more than 30 days after finding of the evidence which constituted the basis for the search." It has also been stated that "a lapse of more than 7 weeks has always rendered the search warrant nugatory." Annot., 100 A.L.R.2d 525, 527 (1965).

There was nothing in the affidavit from which the Commissioner could reasonably conclude that any of the activities described continued beyond the dates stated in the affidavit, much less for the more than four months that elapsed before the warrant issued.[7] The affidavit therefore failed to provide any basis for a finding that counterfeit notes or paraphernalia were probably present in appellant's house trailer or upon his person when the warrant issued.

We are thus compelled to conclude that the May 5 search was unlawful and that the evidence seized in that search should have been suppressed.

As noted earlier, however, we do not agree with appellant that the $20 Federal Reserve Note which formed the basis for Count II should also have been suppressed on the grounds that it was discovered as a result of the unlawful search. The relevant circumstances are these.

The unlawful search of appellant pursuant to the warrant disclosed that he.. did not have a wallet on his person. In response to an inquiry, he stated that he did not carry one.[8]

On May 6 the agents went to the home of Tom Mishler, whose identity they had previously learned from an independent source, and with his consent conducted a search. While the agents were thus engaged, Mrs. Yackley, Mishler's daughter, volunteered to one of the agents that she had seen appellant the evening before (at a time shortly before he and his trailer were searched) and that appellant had displayed a wallet containing currency.

On May 7 the agents returned to the Orville Killingbeck farm, where appellant was employed and his trailer was parked, and asked Mr. Killingbeck if he had seen appellant's wallet. Mr. Killingbeck responded that he had found the wallet in his barn the previous morning. He delivered the wallet to the government agents. The wallet contained the counterfeit note in question.

In determining whether the wallet and its contents should have been excluded because of the unlawful conduct of the agents on May 5, the question we must answer is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." [9]

Accepting uncontradicted testimony of the government agents, it seems clear that the wallet was come at by sufficiently distinguishable means and that there was no connection between the search May 5 and the ultimate discovery of the wallet. All that the agents learned from the illegal search was that appellant had no wallet on his person, and that he denied carrying one. They were not led to the Mishler home by this discovery; they knew of Mishler's connection with appellant from independent sources. Their visit was part of the continuing

---

7. This deficiency in the affidavit might well have been corrected if the government agent had·included the fact, known to him at the time, that a steady stream of counterfeit notes of the same type as that received at the Portland bank in July 1965 continued to circulate in Oregon up to the time of the search. As we have noted, since this fact was not known to the Commissioner we must disregard it here. See note 5.

8. The trial court ruled this statement inadmissible under Miranda v. Arizona, 386 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We assume it was inadmissible either on this basis or as oral fruit of the unlawful search. See Wong Sun v. United States, 371 U.S. 471, 484–487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

9. J. Maguire, Evidence of Guilt 221 (1959), quoted and adopted in United States v. Wade, 388 U.S. 218, 241, 87 S. Ct. 1926, 18 L.Ed.2d 1149 (1967); Hoffa v. United States, 385 U.S. 293, 309, 87 S. Ct. 408, 17 L.Ed.2d 374 (1967); Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

investigation of Durham and of possible counterfeiting activity in the Portland, Oregon, area, not an effort to locate Durham's wallet. They did not inquire of Mrs. Yackley regarding appellant's wallet, or tell her that it was missing. Mrs. Yackley's statement that appellant had a wallet containing currency was volunteered. It was this statement, not the failure to find a wallet when appellant was searched, which led the agents to return to the Killingbeck farm.

In these circumstances, it is fair to say that the wallet and its contents are admissible, both because "the Government learned of the evidence 'from an independent source,' " [10] and because any "connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.' " [11] If the unlawful search or questioning of appellant contributed in any degree to the ultimate seizure of his wallet, its role must be considered *de minimis*.

Nor would suppression of the wallet and its contents contribute significantly to the deterrent purpose of the exclusionary rule. That purpose would appear served by exclusion of the evidence seized in the initial unlawful search. The price is too high and the advantage too uncertain to make it reasonable to suppose that law enforcement officers will be encouraged to indulge in unlawful searches, knowing that what they find will be suppressed, in the hope of obtaining admissible evidence as remote and fortuitously acquired as this.[12]

Appellant also complains of the court's denial of his motion to require disclosure of confidential informants who provided the information recited in paragraphs four and five of the affidavit supporting the application for a search warrant.[13] He argues that such disclosure was required by Roviaro v. United States, 353 U.S. 53, 60–61, 77 S.Ct. 623, 628, 1 L.Ed. 2d 639 (1957), where the Court stated broadly that the government's privilege to withhold an informer's identity must give way where "disclosure of an informer's identity, or the contents of his communication, is relevant and helpful to the defense of an accused." Appellant asserts such information might be relevant and helpful here because the informants may be able to explain how incriminating evidence came to be in appellant's trailer and wallet—circumstances of which appellant denies knowledge.

With respect to paragraph four, the government advised the court that the information in it did not come from a confidential informant but rather from a government undercover agent named Blue, and furnished a copy of this agent's report to appellant. Although paragraph four is a rather inaccurate statement of the contents of Blue's report, we think the court was justified in accepting the government's explanation, and rejecting appellant's suppositious claim that the paragraph was based on information from an unnamed informant.

The government declined to identify the informant from whom it had obtained the information in paragraph five on the ground that to do so would expose the informant to risk of physical harm.

Before passing on the motion, the court followed the sensible course of interviewing the informant *in camera,* in the presence of a reporter. It concluded that the informant could give no information helpful to appellant

10. Wong Sun v. United States, 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), quoting Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

11. Id., quoting Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1940).

12. Cf. Pitler, "The Fruit of the Poisonous Tree," Revisited and Shepardized, 56 Calif.L.Rev. 579, 589, 592 (1968).

13. See note 2.

and refused to disclose his identity in the face of the risk of harm. The transcript of the interview is before us as a sealed exhibit, and we agree with the district court's conclusion. The informant's knowledge was largely inadmissible hearsay and was neither relevant nor helpful to appellant's defense. In these circumstances, the court acted within its discretion [14] in refusing to require a disclosure of identity which might have endangered the informant.

■ Appellant contends that the court erred in refusing to strike from evidence the counterfeit note described in paragraph one of the affidavit. The bill was received without objection, though the grounds which counsel later urged were known to him at the time of proffer. The motion to strike was not filed until both sides had rested, immediately before argument and the instruction of the jury. The district court placed its denial of the motion squarely on the ground that the objection came too late, a matter which rested in the court's discretion.[15] Moreover, the question of admissibility of the evidence itself raised an issue requiring the exercise of the trial court's discretion. Glavin v. United States, 396 F.2d 725, 728 (9th Cir. 1968). Presumably, only this latter question will be presented if a new trial is had. The record upon which the ruling will be made may be quite different from that now before us, and determination of the issue should therefore abide the event.

Reversed.

14. The decision to disclose rests within the trial court's discretion. Garibay-Garcia v. United States, 362 F.2d 509, 510 (9th Cir. 1966). See also Roviaro v. United States, 353 U.S. 53, 62, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

15. Sang Soon Sur v. United States, 167 F. 2d 431, 433 (9th Cir. 1948). The motion was based on the grounds that there was no connection between the counterfeit note and the defendant except for the unexplained fact that the license number of his automobile was written on it. The evidence was offered and received only

after appellant's counsel had himself elicited testimony from several witnesses that they did not know how appellant's license number came to be on the bill. Failure to object as soon as the applicability of the objection is known is said to constitute a waiver of the objection, which thereafter may be properly denied. See 1 J. Wigmore, Evidence § 18, at 321–23 (3d ed.1940); C. McCormick, Evidence § 52, at 115 (1954). A motion to strike is governed by this rule where the evidence involved should have been objected to when offered, as was the case here. 1 J. Wigmore, supra, at 331–32.