**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JAMES GRANT, III,
*Defendant-Appellant.*

No. 11-50036

D.C. No.
2:10-cr-00406-
GW-1

OPINION

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted
March 8, 2012—Pasadena, California

Filed June 11, 2012

Before: Sidney R. Thomas, Kim McLane Wardlaw, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

**COUNSEL**

Sean K. Kennedy, Federal Public Defender, Matthew B. Larsen (argued), Deputy Federal Public Defender, Los Angeles, California, for defendant-appellant James Grant, III.

André Birotte Jr., United States Attorney, Robert E. Dugdale, Assistant United States Attorney, Kristen A. Williams (argued), Assistant United States Attorney, Los Angeles, California, for plaintiff-appellee United States of America.

**OPINION**

BERZON, Circuit Judge:

James Grant III ("Grant") was convicted for being a felon in possession of a firearm. We consider in this case whether

the basis for the search that resulted in Grant's conviction was so attenuated as to require suppression of the firearms evidence found in the search. The district court held that there was indeed a lack of probable cause to issue the warrant authorizing the search, but invoked the good faith reliance doctrine of *United States v. Leon*, 468 U.S. 897 (1984), to permit use of the evidence. We agree as to probable cause but not as to the application of the *Leon* doctrine, and so reverse.

## I.  Background

Detective Ryan Thompson ("Thompson") obtained a warrant to search Grant's home. Thompson sought to recover, among other evidence, a firearm used in a homicide that had occurred nearly nine months earlier. There was no indication that Grant had been involved in the homicide. Thompson suspected, however, that two of Grant's sons had some connection to the murder or its aftermath.

As it turned out, the searching officers turned up nothing pertinent to the homicide. But, they did find two firearms and ammunition belonging to Grant. The government then charged Grant, who had been convicted of a felony years before, with being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1).

Grant moved to suppress the firearms evidence as the fruit of an illegal search, maintaining that there was no probable cause for the issuance of the search warrant and that the *Leon* doctrine did not apply. The district court denied the motion.[1]

---

[1]The government seized Grant's firearms and ammunition pursuant to the first and second sections of the search warrant, which authorized seizure of "[a]ny .357 or .38 caliber firearm" and "[a]ny .357 or .38 caliber ammunition, gun cleaning paraphernalia, holsters, ammunition belts, original box packaging." Because the police did not seize any items pursuant to the remainder of the warrant, we address the validity of only these two sections.

## A.  The Affidavit

To support his August 2009 application for the warrant to search Grant's home, Thompson submitted an affidavit containing the following facts:

On January 2, 2009, police found a man's body in Culver City, California. The man had died from multiple gunshot wounds. A witness who had heard the shots said that he saw a black male, with a dark complexion and a thin build, flee the area. Forensic tests on bullets recovered from the crime scene indicated that they had all been fired from a single gun, which most likely used a .38 Special or .357 Magnum cartridge.

During a search of the victim's residence, Thompson discovered an empty box for a BlackBerry cell phone but found no phone in the residence, in the victim's car, or at his workplace. Using the International Mobile Equipment Identity (IMEI)[2] number inscribed on the box, Thompson obtained phone records for the BlackBerry and discovered that, a few weeks after the crime, a SIM card connected to a phone number ending in "4348" had been put into the BlackBerry for approximately six minutes and then returned to a Nokia cell phone. Months later, another individual activated a cell phone number using the victim's BlackBerry. The police conducted a search of that individual's residence; nothing in the affidavit suggests that they found anything connecting him to the homicide.

Upon investigating records associated with the "4348" number, Thompson discovered that several members of the "Inglewood Family" and "Centinela Park" gangs had called or received calls from that number. Davonte Hatcher ("Davonte"), one of Grant's sons, was one of those gang members. Thompson also learned that Davonte had been arrested in Los Angeles on April 28, 2009 for assault with a

---

[2]Each cell phone has a unique IMEI number.

deadly weapon. According to the arrest report, Davonte had pointed a six-inch revolver into the chest of the assault victim; the weapon was never recovered.

Subsequently, Thompson obtained a warrant to search Davonte's cell phone, which was in law enforcement custody. The search revealed that Davonte's phone had been used to call many of the same numbers as the "4348" number and that it contained a photograph of a silver revolver. A firearms expert identified the gun in the picture as "possibly a .357 caliber," which was consistent with the model suspected to have been used in the homicide.

While investigating Davonte, Thompson learned that Davonte has a half-brother, James Grant ("James"), who was likewise an active "Centinela Park" gang member. James had been in the vicinity when the police arrested Davonte in April. Thompson noted that James, who is six feet tall and weighs 150 pounds, has a more slender build than Davonte and thus more closely matched the description of the homicide suspect.

Thompson began investigating James, obtaining a warrant to track James's movements through GPS surveillance of his phone. On June 5, the GPS surveillance led police officers to a park, where gunfire erupted and James was shot in the arm. An officer reported seeing James discard a firearm into a nearby bush; the gun was later recovered and identified as a .45 caliber Taurus semi-automatic handgun, a model dissimilar from the one suspected to have been used in the January homicide. The police detained James, who was then transported to a hospital, treated for his wound, and released the same day. Thompson later obtained a search warrant to compare DNA recovered from the shirt James wore to the hospital with DNA recovered at the scene of the homicide; the DNA did not match.

According to continued GPS surveillance, James traveled to Adelanto, California, shortly after his release from the hos-

pital and remained there until June 13. Thompson learned that a woman with whom Grant had previously lived in Ohio, Tina Benjamin ("Benjamin"), had a listed address in Adelanto. Davonte's mother, Sharon Hatcher ("Sharon"), also informed Thompson that Grant lived in Victorville, California; as Thompson noted in the affidavit, "Adelanto is located in the general area of Victorville." Furthermore, Thompson discovered that Benjamin and Grant shared a post office box address in Adelanto. Some time later, Davonte asked Djuane Fletcher, another son of Grant's, to call Grant at a telephone number ending with "9999"; although the number was no longer in service, it turned out to be registered to Benjamin.

In addition to tracking James, Thompson also continued to investigate Davonte, whom he interviewed in jail about the victim's BlackBerry. Although Davonte initially denied having pawned the phone, he admitted doing so after Thompson showed him a receipt with his name on it. Thompson further recorded in the affidavit:

> We spoke with [Davonte] Hatcher more about the phone and confronted him about the fact that we knew his SIM card was put into this Blackberry Bold cell phone two days before he pawned the phone. Hatcher continuously told us he could not remember who gave him the phone but suggested it was "probably one of the little homies" and provided us some gang monikers of "Flintstone and Trouble" as two gang members from "Inglewood Family 94 set" that may have given him the phone. Hatcher said these two subjects always have stuff for sale and although he could not remember for sure, may have given him this Blackberry Bold cell phone. Although Hatcher could not remember exactly who gave him the Blackberry Bold cell phone, he immediately stated that there was no way his brother James Grant provided him with the cell phone.

Shortly after his interview with Thompson, Davonte called his mother, Sharon, and told her that "they [were] trying to find out about a phone that was stolen." When Sharon asked him what the phone had to do with "this case," Davonte replied that the phone had nothing to do with the case for which he was in custody, and instead involved a different incident.

Sharon visited Davonte in jail a few days later, and the two had the following recorded exchange:

Sharon:    So oh boy says he gonna charge for a cell phone, that's what he say?

Davonte:    No, with the guns he found in the house.

Sharon:    That's what he want to charge you with, he told me with receiving stolen property

Davonte:    I don't care he could do that.

Sharon:    He told me receiving stolen property.

Davonte:    That's what he said?

Sharon:    Hmm, mmm.

Davonte:    He threatened me with the guns he found at the house.

Sharon:    He told me receiving, he know he can't do that that's why he didn't tell me that. Like I said my dead step-father . . . .

Davonte:    I already know.

Sharon:    Yeah so . . . but how did that come about?

(For approximately ten seconds no words are said, however, it sounds as though Davonte is making some sort of hand gestures or is doing some type of non-verbal communication . . . Davonte laughs after about ten seconds and continues talking with Sharon[.])[3]

Davonte
(Laughs):  Remember when he had that for a whole month.

Sharon:   But it was there longer than that.

Davonte:  Nah, I'm talking about when he had . . . When me and my daddy had to go track him down . . . .

Sharon:   Hmm mmm.

Davonte:  That's when, after that, that's when I got it . . . .

Based on the forgoing, Thompson surmised that "it is possible Davonte and his father, James Grant III, were looking for James." Thompson further explained:

Based on the statements between Sharon and Davonte Hatcher during the visit, coupled with Hatcher's statements in our interview about the fact there was no way [James] gave him the Blackberry Bold cell phone although he could not truly remember where he obtained the cell phone, I believe it is possible [James] gave Hatcher the Blackberry Bold cell phone that was stolen from the victim when the homicide occurred.

---

[3]This is an annotation by Thompson.

Reciting the facts and inferences described above, Thompson applied for a warrant to search the Adelanto residence for guns and ammunition that could have been used in the homicide. To support his conclusion that the evidence may be found in the home, Thompson relied in particular on 1) the various sources indicating that Grant lived in Adelanto with Benjamin; 2) the GPS data showing that James visited Adelanto after he was shot; and 3) his inference that Davonte's statement to his mother referred to James and to the Black-Berry, and thus connected James to evidence from the homicide. Thompson also noted that despite having executed search warrants for "numerous residences associated with [James], [Davonte], and other gang associates of theirs," he had not located any firearms that could possibly match the one used in the homicide.

## B.   Search of Grant's Home

A judge on the California Court of Appeal issued a search warrant for the Adelanto residence. Among other things, the warrant authorized the police to search for and seize:

> 1. Any .357 or .38 caliber firearms.
>
> 2. Any .357 or .38 caliber ammunition, gun cleaning paraphernalia, holsters, ammunition belts, original box packaging and any receipts related to purchases of these items.

Thompson and other officers conducted a search of the residence the following day and encountered Grant, who admitted to living there. During the search, the officers did not find the firearms they were searching for, but did discover two other firearms—a "[s]ilver Smith & Wesson .45 caliber semi-automatic handgun" and a "[b]lack, wood handled Charter Arms .38 caliber revolver"—as well as ammunition and packaging for the firearms and ammunition.

In an interview following the search, Grant told Thompson that he had brought the firearms to California from Ohio, and that he had previously, in Ohio, been convicted for felony possession of narcotics.

## C.   The Criminal Proceedings

A federal grand jury indicted Grant for violating 18 U.S.C. § 922(g)(1), which prohibits felons from possessing firearms and ammunition. Grant moved to suppress the evidentiary use of the guns and bullets, contending that they had been obtained in an illegal search of his home. The district court agreed that insufficient probable cause supported the search warrant but determined that Thompson's reliance on the warrant fell within the good faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984). After the district court denied his suppression motion, Grant pled guilty to the § 922(g)(1) charge on the condition that he could withdraw the plea if we were to decide on appeal that his motion was wrongly denied. Grant was sentenced to forty-six months imprisonment.

## II.   DISCUSSION

Grant appeals the denial of his motion to suppress, contending that (1) the warrant was not supported by probable cause; and (2) the officers' reliance on the warrant did not fall within *Leon*'s good faith exception. "We review de novo the district court's denial of a motion to suppress evidence," *United States v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011), and address each of these arguments in turn.

## A.   Probable Cause

[1] Probable cause for a search requires a " 'fair probability that contraband or evidence of a crime will be found in a particular place,' based on the totality of the circumstances." *Dawson v. City of Seattle*, 435 F.3d 1054, 1062 (9th Cir.

2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "The most convincing proof that the property was in the possession of the person or upon the premises at some remote time in the past will not justify a present invasion of privacy." *Durham v. United States*, 403 F.2d 190, 193 (9th Cir. 1968). We review for clear error the decision to issue a search warrant, giving "great deference" to an issuing judge's finding that probable cause supports the warrant. *Krupa*, 658 F.3d at 1177.

The affidavit here provides no evidence suggesting that Grant was involved in the January homicide. Nor does it link Benjamin to the crime in any way. Instead, it relies on connections between Grant and two of his sons, Davonte and James, to conclude that evidence from the crime may have been in the Adelanto home. The totality of the connections to Grant, however, is decidedly weak, and does not amount to probable cause to search his residence.

### 1. Davonte

Undoubtedly, the affidavit identifies a connection between Davonte and the homicide. Not only were there calls made between his phone and the number associated with the SIM card that had been put into the victim's phone shortly after the crime, but Davonte also admitted that he had pawned the victim's BlackBerry. In addition, he had been arrested for assault with a revolver, and there was a picture of a silver revolver that matched the profile of the potential murder weapon on his phone. These facts sustain a fair inference that Davonte at some point possessed the gun used in the homicide.

**[2]** But the affidavit does not support a reasonable inference that Davonte brought the gun or ammunition used in the homicide to Grant's home. The affidavit references only one possible contact between Davonte and his father: Davonte mentioned in his conversation with Sharon that he and his "daddy had to go track him down" and "[t]hat's when, after

that, that's when [Davonte] got it." However, that conversation was entirely opaque; Davonte and Sharon did not say who "him" was, what "it" was, or when whatever they were talking about occurred. There was no mention of James, or of any brother, in the conversation; the only reference to a "him" other than Grant was to Sharon's "dead step-father."

At best—and this would be quite a stretch—Davonte's conversation with Sharon may support a link between Grant and the victim's *phone*, given Sharon's inquiry about a cell phone earlier in the conversation. But by the time the police searched Grant's home, they had already accounted for the phone as having been purchased by another individual. In contrast, Davonte's statement to Sharon provides no foundation to support a connection between Grant and the *gun used in the homicide*. The only guns mentioned in the conversation were "the guns . . . found in the house,"[4] on which the police threatened to base charges against Davonte. These guns could not have included the murder weapon, because the latter was never found.

Furthermore, nothing in the affidavit suggests that Davonte visited Grant's home after the homicide. In fact, Davonte was incarcerated from late April through the time of the search in August.

[3] Without a link to Grant or his residence with respect to the murder or the murder weapon, Davonte's potential connection to the homicide and possible possession of the gun at some point are not sufficient to support a "fair probability," *Dawson*, 435 F.3d at 1062, that the gun was in Grant's house in August 2009.

---

[4]Presumably, "the house" referred to Davonte's house.

### 2.  James

The references in the affidavit to a connection between Grant and James likewise fail to establish a "fair probability," *id.*, that the gun or ammunition from the homicide would be found in Grant's home.

The facts do support an inference that James visited Grant for a week after he was shot in June. The GPS surveillance data indicates that James traveled to Adelanto after being discharged from the hospital. That Benjamin had her address listed as being in Adelanto; that she and Grant shared the same P.O. box address in Adelanto; that she and Grant had previously resided at the same address in Ohio; that Grant was said to live in Victorville, which is nearby; and that Davonte had asked Djuane to call Grant at a number registered to Benjamin, support an inference that Grant currently lived with Benjamin at her Adelanto address. And individuals do frequently seek care from family members after being injured. It is therefore quite plausible that James went to Grant's residence after being shot in the arm.

**[4]** The affidavit, however, fails to provide any tenable connection between James and the gun. Without that link, an inference that James brought the gun to Grant's residence when he visited is unreasonable.

First, the affidavit provides no reasonable basis for inferring that James was involved in the homicide. According to the affidavit, James's DNA was *not* a match for the DNA on the victim's BlackBerry or jeans pocket, and although he may have fit the description of the suspect as "Male, Black, dark complexion, thin build," that description was much too general by itself to support an inference that James was the killer. "Under the law of this Circuit, mere resemblance to a general description is not enough to establish probable cause." *United States v. Lopez*, 482 F.3d 1067, 1073-74 (9th Cir. 2007)

(quoting *Grant v. Long Beach*, 315 F.3d 1081, 1088 (9th Cir. 2002)).

Second, the affidavit does not support an inference that James obtained the gun from another person following the homicide. It specifically identifies only Davonte as a person who was connected to the homicide and may have possessed the gun, and provides no facts suggesting that Davonte gave the weapon to James. Instead, the document relies heavily on Davonte's conversation with Sharon, in which Davonte made the cryptic statement that he and his "daddy had to go track *him* down" and "that's when [Davonte] got *it*" (emphases added). Even if it is plausible to think that "it" referred to the victim's BlackBerry given Davonte and Sharon's earlier reference to a possibly stolen phone—again, a stretch, as the last reference before that part of the conversation was to the guns the police found in Davonte's house, not the BlackBerry—it is unreasonable, for reasons already indicated, to infer from the conversation that "him" referred to James, without some other basis for suspecting that James had the BlackBerry. That Davonte asserted during his interview with Thompson that he did *not* get the BlackBerry from James is surely not sufficient to constitute such a basis. And even if it were, the district court correctly observed that "[t]he problem is that the cell phone is not the gun." In other words, even if Davonte and Sharon *were* talking about James, the conversation at best links James only to the phone, not to the gun used in the murder.

Other facts in the affidavit do suggest that Davonte and James had a general association. The affidavit indicates that Davonte and James were half-brothers, and were affiliated with the same gang. It also states that Davonte was arrested on an outstanding assault warrant in late April after confronting a police officer who had approached James because James was near the site of a reported burglary. These facts, however, do not support a reasonable inference that James had, or that Davonte gave James, the gun from the homicide.

The affidavit links James to only one gun: a .45 caliber Taurus semiautomatic recovered after the gunfight in early June. Nothing in the affidavit connects James either to the silver revolver pictured in Davonte's phone or to any other .357 or .38 caliber gun.

Moreover, if the affidavit had provided a basis for suspecting that James was involved in the homicide or obtained the weapon from Davonte, it does not sustain a reasonable inference that James kept the gun until June when he visited Grant's home and left it there. If James had been involved in the homicide, then he would have had to have kept the gun for over six months, from January 2 until June 5. If James had instead received the gun from Davonte, he would still have had to kept it from at least April 28, when Davonte was arrested. The affidavit sets forth no basis for inferring that James would have retained the murder weapon for such an extended period of time, as opposed to getting rid of it.

It is also exceedingly speculative to think that James would have brought the gun to the park in June and somehow held onto it—despite discarding another gun, the .45 caliber semi-automatic, into nearby bushes—when the police pursued and detained him. Likewise, there is no reasonable basis for believing that James would have kept the murder weapon for six months, gone home to get it after he was discharged from the hospital, taken it to Grant's home, and left it there when he departed. And even assuming that the affidavit plausibly sets forth such an unlikely chain of events, it provides no facts suggesting that the gun would still be in Grant's home over two months later, when the warrant was executed.

On this point, the case law on staleness is instructive. Information offered to support a search warrant application becomes stale when enough time has elapsed such that there is no longer " 'sufficient basis to believe . . . that the items to be seized are still on the premises.' " *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997) (quoting *United States v.*

*Gann*, 732 F.2d 714, 722 (9th Cir. 1984)). To avoid staleness, "[t]he facts must show that the property to be seized was known to be at the place to be searched so recently as to justify the belief that the property is still there at the time of the issuance of the search warrant." *Durham*, 403 F.2d at 194.

In *Durham*, for example, we held that an affidavit was stale where it described the passing of a counterfeit note and purchase of paper useable in counterfeiting ten months before the warrant was issued, notwithstanding the affidavit's description of the defendant's involvement in counterfeiting activity that may have occurred up to seventeen weeks preceding the warrant's issuance. *See* 403 F.2d at 194. *Cf. United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988) (concluding that five-month-old information regarding the presence of marijuana cultivation equipment in the defendant's home was not stale because "marijuana cultivation is a long-term crime and the affidavit includes an experienced DEA agent's opinion that cultivators often keep the equipment at their residences between growing seasons"). Although a "mere lapse of substantial amounts of time," does not undermine a warrant if "a continuing pattern or other good reasons" suggest that the evidence sought remains in the location to be searched, *Lacy*, 119 F.3d at 745-46, a significant gap in time can diminish the probability that the evidence will be uncovered in the search, *see Durham*, 403 F.2d at 195. In other words, because evidence can be moved or disposed of, the affidavit must support an inference that it is presently in the residence to be searched, regardless of its past position.

**[5]** The six-month gap between the homicide and James's visit to Grant's house undermines any inference that if James had been involved in the homicide, he maintained possession of the gun during the entire period afterward and ultimately brought it to Grant's residence. Similarly, if James had obtained the gun from Davonte, he must have done so before Davonte was incarcerated in April. The time lapse between Davonte's incarceration and James's visit to Adelanto also

undermines an inference that James kept the gun until his trip to Grant's home. The additional two-and-a-half-month gap between James's visit and the search further diminishes the likelihood that the gun was still in the house when the search occurred, even if it had been there earlier. The affidavit provides no evidence of a "continuing pattern" or "other good reasons," *see Lacy*, 119 F.3d at 746, to support an inference that a murder weapon brought into Grant's home in early June would remain there until the end of August. Such an inference is especially unlikely given the ease of getting rid of a gun sought by the police in a homicide investigation, and the strong incentive to do so—whether by tossing it into a river, throwing it into a trash can, or disposing of it in one of a million other places.

[6] In sum, the affidavit does not establish a "fair probability" that the gun or ammunition from the homicide would be in Grant's home nearly nine months after the murder. *Dawson*, 435 F.3d at 1062. Accordingly, we agree with the district court that the warrant was not supported by probable cause.

## B. Good Faith Reliance

Although the district court determined that the warrant should not have issued in the first place given the lack of probable cause, it nevertheless held that Thompson's execution of the warrant fell within the Leon good faith reliance exception. *See United States v. Leon*, 468 U.S. 897, 923 (1984). We review *de novo* the district court's application of the *Leon* exception. *United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006).

[7] Suppression of evidence seized pursuant to a warrant unsupported by probable cause is not appropriate if the government relied on the warrant in "good faith." *See Leon*, 468 U.S. at 923. However, suppression "remains an appropriate remedy" when a warrant is based on "an affidavit 'so lacking in indicia of probable cause as to render official belief in its

existence entirely unreasonable.' " *Id.* (quoting *Brown v. Illinois*, 422 U.S. 590, 611 (1975) (Powell, J., concurring)); *accord Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012); *Luong*, 470 F.3d at 903. As the Supreme Court recently explained, "the threshold for establishing this exception is a high one" because " '[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination.' " *Messerschmidt*, 132 S. Ct. at 1245 (quoting *Leon*, 468 U.S. at 921). It is the role of the magistrate, after all, " 'to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.' " *Id.* (quoting *Leon*, 468 U.S. at 921). But if the affidavit fails to "establish at least a colorable argument for probable cause," *Luong*, 470 F.3d at 903, it fits within the "narrow exception" to *Leon*'s good faith reliance rule. *Messerschmidt*, 132 S. Ct. at 1245.

**[8]** Here, the officers' reliance on the warrant was " 'entirely unreasonable,' " *id.* (quoting *Leon*, 468 U.S. at 923). The affidavit simply does not set out any plausible connection between Grant's home and the gun or ammunition used in the homicide.

First, there is nothing in the affidavit suggesting that Grant had an independent connection to the homicide, nor is there any ground for inferring that Davonte, who may have had such a connection, visited Grant's home between the homicide and when he went to jail for the unrelated assault.[5]

In addition, any link through James was so weak as to be unreasonable to rely on for probable cause. The affidavit set forth no evidence suggesting that James was involved in the homicide; James's phone number was not among the numbers

---

[5]If anything, Davonte's attempt to have his brother Djuane call Grant at a disconnected number suggests that Davonte and Grant did not have a close relationship.

connected to the "4348" SIM card, and his DNA did not match the DNA on the victim's phone or jeans pocket.

Furthermore, the affidavit provides no grounds for inferring that James obtained the gun or ammunition used in the homicide from Davonte. Thompson relied heavily on "[Davonte's] statements . . . about the fact there was no way [James] gave him the Blackberry Bold cell phone although he could not truly remember where he obtained the cell phone" to conclude that it was possible that James had, in fact, given Davonte the victim's BlackBerry phone—and, presumably, the gun as well. But an objective examination of the affidavit shows that Davonte's denial of James's involvement was not sufficient to implicate James. In response to Thompson's inquiry about who had given him the phone, Davonte replied that he could not remember who had done so, but that it was "probably one of the little homies" from the "Inglewood Family 94 set." In the context of Davonte's trying to narrow down that set of individuals, it was not particularly suspicious that he mentioned and eliminated James; ultimately, Davonte specifically identified "two subjects," from that same group of persons, who "always have stuff for sale," as the individuals who may have given him the phone. Aside from Davonte's *denial* that James had given him the victim's phone, the affidavit provides no reason to interpret Davonte's reference to "him" in the later, vague conversation with Sharon to mean "James" and thus no grounds whatsoever—which would be weak anyway, as "it" was also not identified—for inferring that evidence from the homicide passed between Davonte and James.

In the end, the affidavit establishes with any substantial degree of plausibility only two things connecting James to the murder in any respect: First, James was associated with Davonte through family and gang affiliation. *Cf. United States v. Garcia*, 151 F.3d 1243, 1246-47 (9th Cir. 1998) (rejecting a theory of "guilt by association" based on gang membership alone); *Mitchell v. Prunty*, 107 F.3d 1337, 1342 (9th Cir. 1997) (reasoning that the defendant's conviction rested on the

faulty assumption that gang members usually act in a concerted fashion), *overruled in part on other grounds by Santamaria v. Horsley*, 133 F.3d 1242 (9th Cir. 1998) (en banc). And second, James matched an extremely general description of the suspect: "Male, Black, dark complexion, thin build."

Thompson deduced in the affidavit that Grant's home was a reasonable target because police had not found evidence from the homicide in other, more likely places. However, this deductive reasoning provides a "colorable argument for probable cause," *Luong*, 470 F.3d at 923, only if it is plausible that James or someone else (1) had the murder weapon at some point and (2) brought it to Grant's home. As discussed, nothing in the affidavit supports either assumption. On the contrary, Thompson's speculation on such a chain of events is undermined by other facts.

In particular, the affidavit states that James disposed of a .45 caliber hand gun immediately before being detained by police in June. Nothing in the affidavit suggests that James *also* had, at that time, possession of an additional firearm matching the caliber of the weapon used in the homicide. Moreover, it is exceedingly unlikely that James would retain one weapon while discarding the other as he fled from the police. James was also presumably searched for weapons when he was detained; the affidavit does not indicate that the police found any on him. Nor is it objectively reasonable to assume in the alternative, with no basis for doing so, that after being treated for his gunshot wound in the hospital and before leaving for Adelanto, James would retrieve the firearm used in the homicide and bring it to Grant's home. Notably, James was shot, detained, and taken to the hospital around 10:20 PM on June 5, and the GPS tracking data showed that James was already in Adelanto by 1:37 PM on June 6. This timing suggests that James left for Adelanto either immediately after he was discharged from the hospital or shortly thereafter. Accordingly, the affidavit fails to support a reasonable infer-

ence that if James ever had the gun, he brought it to Grant's residence.

**[9]** Finally, the affidavit provides no basis for concluding that the sought-after evidence might be in Grant's home nearly nine months after the homicide and over two months after James's visit. Even if the gun used in the crime had somehow made its way to Grant's home, it was not objectively reasonable for the officers to rely on an affidavit that set forth no "continuing pattern or other good reasons," *Lacy*, 119 F.3d at 746, for why the evidence would still be there.

The affidavit here is considerably weaker than the one challenged in *Luong*, in which we held that the good faith exception did not apply. 470 F.3d at 902-04. In *Luong*, the police submitted an affidavit to support the application for a warrant to search a residence visited by the defendant, a suspected methamphetamine manufacturer. *Id.* at 900. Among other things, the affidavit stated that the defendant and another individual had left the residence and driven to a Home Depot, carrying "a red high pressure hose." *Id*. After purchasing "a small adapter fitting" for the hose, the two men drove back to the residence. *Id.* The officer who authored the affidavit concluded "by stating that she recognized the hose as a common tool used with a vacuum pump during the production of methamphetamine." *Id.* A magistrate judge issued a warrant within twenty-four hours. *See id.*

In rejecting application of the *Leon* exception, we observed that "[t]he affidavit does not assert that officers saw a vacuum pump at the residence, only that such a pump is commonly used with a high pressure hose." *Id.* at 903. In addition, we noted that "[t]here is also no evidence that the hose was obtained from the backyard or the garage, or—despite seven additional hours of surveillance—that the fitting purchased at Home Depot was ever taken into the backyard." *Id*. at 903-04. Notably, we held that the good faith exception did not apply in *Luong* notwithstanding that the police (1) observed the

defendant with potentially incriminating evidence shortly after he had left the residence; and (2) saw the defendant driving back toward the residence with additional, possibly incriminating evidence a few hours before the search.

Here, in comparison, there was significantly less of a basis for inferring that James, who was never connected to the murder nor seen with the gun nor said by any witness to have possessed it, brought the gun to Grant's home six months after the homicide. If there was not sufficient indicia of probable cause to apply the good faith exception in *Luong*, then there certainly were not sufficient indicia to apply it here.

The government relies on *United States v. Crews*, 502 F.3d 1130 (9th Cir. 2007), in support of its position that we should apply the good faith exception. But this case bears little resemblance to *Crews*. In *Crews*, the police chased one of the defendants to a location near an apartment, where they arrested him for attempting to elude the police after he had failed to pull over his vehicle. *Id.* at 1133. They also discovered a .22 caliber revolver in a nearby bush. *Id.* The car that the defendant had been driving was registered to his co-defendant at the nearby apartment. *Id.* As felons, both defendants were prohibited from possessing firearms. *Id.* Following the chase and Crews's release from custody, law enforcement surveilled the apartment and observed the defendants entering and leaving it several times. *Id.* 1133-34. Based on these and other observations, the police suspected that they would find further evidence in the apartment of the defendants' being felons in possession of a firearm, and, within two weeks of the arrest obtained a search warrant for that location. *See id.* at 1134. The warrant authorized police officers to search for ".22 caliber ammunition, firearm cleaning kits, magazines, receipts and other evidence of firearm possession, as well as items of identification that would show dominion over the places searched." *Id.*

We held in *Crews* that "[o]n its face, the affidavit was not so lacking in indicia of probable cause as to render reliance

upon it objectively unreasonable." *Id.* at 1136. In so holding, we reasoned that the affidavit sufficiently alleged a reasonable nexus to the apartment through its references to: the defendant's arrest and discovery of the .22 caliber revolver nearby; registration of his co-defendant's car, which the defendant had been driving, to the apartment address; police surveillance of the defendants at the apartment; the officer's statement, based on his training and experience, that felons convicted of drug crimes, such as the defendants, often keep firearms for protection; and the officer's documented experience that further evidence of firearms possession is often found at a suspect's residence. *Id.* at 1137. Based on this and other information set forth in the affidavit, we held that the affidavit presented a "colorable argument" for probable cause and that the good faith exception therefore applied. *Id.*

What is notable about *Crews*, in contrast to this case, is that the location searched had several connections to the material being sought: It was near where the gun had been found; the defendant was seen at the location at a time close to when the search was conducted; and the car the defendant had been driving when the gun was found nearby belonged to a resident of the place searched.

**[10]** Here, in contrast, the connections between the gun and Grant's house are entirely speculative. The relevant gun was never known to be anywhere near Grant or Grant's house, and the person who may have visited Grant, James, was also not known ever to have been anywhere near the gun. Nor was there any evidence suggesting that Davonte, who may have had a connection to the gun, was at Grant's house at any time after the murder, much less close to the time the search occurred.

**[11]** The government also relies on *Leon* itself to argue that the good faith exception should apply here. But the facts of *Leon* diverge substantially from the facts of this case. In *Leon*, although the government had received tips about sus-

pected drug activity at a residence from "a confidential informant of unproven reliability," the police subsequently undertook an "extensive investigation" that corroborated this information. 468 U.S. at 901. For example, the police observed an automobile belonging to one of the defendants, who had previously been arrested for possession of fifty pounds of marijuana, arrive at the residence; the driver entered the house and exited shortly afterward carrying a small paper sack. *Id.* Subsequently, the police observed several additional persons, at least one of whom had prior drug involvement, arriving at the residence and leaving with small packages. *Id.* at 902. The police also observed two of the defendants board separate flights for Miami, and when the two returned to Los Angeles together, the police found marijuana in their luggage. *Id.* In addition, cars parked in front of the residence were determined to belong to those two defendants. *Id.* Based on these and other observations, the police applied for a warrant to search the residence for evidence of drug activity, and the warrant issued a month after police had first been tipped off by the confidential informant. *See id.* at 902-03. The affidavit in *Leon* thus described the police's repeated observations of potential drug activity at the residence shortly before the warrant issued; it also identified direct evidence of drug possession by two of the defendants associated with the residence. Here, there were no such indicia of a nexus between the January homicide and Grant's home.

Nor does the Supreme Court's recent decision in *Messerschmidt* support application of the *Leon* doctrine here. *See* 132 S. Ct. 1235. In *Messerschmidt*, the police executed a warrant to search a residence for evidence of firearms and gang affiliation materials belonging to a suspect involved in what the affidavit described as a "spousal assault *and* an assault with a deadly weapon." *Id.* at 1247. The victim of the assault told the investigating officer that the suspect had fired a sawed-off shotgun at her and also informed the officer about the suspect's gang affiliation. *Id.* at 1241. Based on this and other

information, the investigating officer obtained a warrant authorizing a search for "[a]ll handguns, rifles, or shotguns of any caliber" and "[a]rticles of evidence showing street gang membership or affiliation with any Street Gang" *Id.* at 1242.

Despite the warrant's potential overbreadth in authorizing the search of all firearms when there was information about only a particular one, the Court held that the *Leon* exception applied. *Id.* at 1246-47. In so holding, the Court reasoned that the suspect, a known gang member, had just fired the sawed-off-shotgun in public five times in an attempt to murder the victim on the asserted ground that she had "called the cops on him"; under these circumstances, it was reasonable to conclude that the suspect owned other firearms as well. *Id.* at 1246. In addition, the court noted that California law allows a magistrate to issue a search warrant for items "in the possession of any person with the intent to use them as a means of committing a public offense," Cal. Penal Code § 1524(a)(3) (West 2011), and that the warrant application specifically referenced this provision as a basis for the search. *Messerschmidt*, 132 S. Ct. at 1246. Based on the suspect's already having attempted to murder the victim and his yelling "I'll kill you" as she tried to escape from him, a reasonable officer could believe that seizure of any firearms in the suspect's possession was necessary to prevent further assaults on the victim. *Id.*

The *Messerschmidt* Court also held that the good faith exception applied despite the warrant's potential overbreadth in authorizing the search of all gang-related evidence. *Id.* at 1247-49. "A reasonable officer," the Court explained, "could certainly view [the suspect's] attack as motivated not by the souring of his romantic relationship with [the victim] but instead by a desire to prevent her from disclosing details of his gang activity to the police." *Id.* at 1247. Gang evidence could thus help to establish motive for the crime and could support bringing additional charges against the suspect. *Id.* In addition, the Court noted that the gang evidence might prove

helpful in impeaching the suspect or rebutting his defenses at trial; for example, evidence that he had ties to a gang that uses guns like the one used in the assault would be relevant to establish that he had access to that type of weapon. *Id.* at 1248. Finally, the Court explained that given the suspect's known gang affiliation, a reasonable officer could conclude that gang paraphernalia found at the residence would help to demonstrate the suspect's connection to evidence found there. *Id.*

As this summary indicates, *Messerschmidt* concerned whether the police relied in good faith on a warrant to search for a wide variety of evidence when the warrant alleged a seemingly narrow crime. In other words, the legal challenge in that case rested on the warrant's purported overbreadth rather than its lack of any nexus to the residence searched. Similarly, *Groh v. Ramirez*, 540 U.S. 551, 557 (2004), which the Court in *Messerschmidt* took pains to distinguish, concerned not whether the warrant application established probable cause to search the particular location at all, but whether the warrant and warrant application properly specified the items seized.

**[12]** Here, in contrast, the problem is much more basic: it concerns whether Thompson relied in good faith on a warrant to search Grant's home *at all*. In other words, was there a plausible connection between Grant's house and *any* evidence of the murder? Accordingly, there is no need here to compare the warrant with the warrant application, as there was in *Messerschmidt*, to determine the proper *scope* of the search. By reading the warrant application alone with an eye toward finding *some* reasonable connection between Grant's house and evidence of the murder, one can ascertain that *none* of the facts recited, voluminous though they were, supply that connection.

A reasonable officer would know that probable cause is not supplied by stating everything one knows about a particular

item one would like to find to solve a murder case, if the mass of facts simply does not plausibly connect the place searched to the item sought. Here, as discussed, none of the facts in the affidavit, singly or en masse, provide a reasonable basis from which to infer that the gun was in Grant's home. Unlike in *Messerschmidt*, where the police could reasonably assume that the evidence they were seeking was associated with the crimes alleged—and had reason to believe that it was in the plaintiff's residence based on the victim's direct statements to that effect, *see* 132 S. Ct. at 1241—it is clear from the face of the warrant application that Thompson had no plausible reason at all to believe the gun was in Grant's home, ever, but most certainly not at the time the warrant was obtained. Here, the magistrate so "obviously erred," *id.* at 1250, in approving the warrant that the officers executing it could not have relied on it in good faith.

\*\*\*

**[13]** We hold that the warrant to search Grant's home did not issue upon probable cause. The underlying affidavit simply did not establish a "fair probability," *Dawson*, 435 F.3d at 1062, that the gun and ammunition associated with the homicide would be found there, or even provide a "colorable argument for probable cause," *Luong*, 470 F.3d at 903. *Leon*'s good faith exception to the officers' execution of the warrant therefore does not apply either. Accordingly, we reverse and remand to the district court for further proceedings consistent with this opinion.

### REVERSED AND REMANDED.